UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DONNA SZESTAKOW, :
    Plaintiff, :
:
v. : 3:10-cv-00567-WWE
:
METROPOLITAN DISTRICT COMMISSION, :
    Defendant. :

## MEMORANDUM OF DECISION ON
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This is an action by plaintiff Donna Szestakow against defendant Metropolitan District Commission, alleging retaliation in violation of the Family and Medical Leave Act ("FMLA") (Count I); discrimination on the basis of disability in violation of the Americans with Disabilities Act ("ADA") (Count II); harassment and discrimination on the basis of disability in violation of the Connecticut Fair Employment Practices Act ("CFEPA") (Count III); retaliatory discharge in violation of the CFEPA (Count IV); retaliatory discharge in violation of the ADA (Count V); and retaliatory discharge in violation of the FMLA (Count VI).  Defendant has moved for summary judgment on all counts.  For the following reasons, the motion will be denied.

### BACKGROUND

The following facts are gleaned from the parties' statements of fact, affidavits, deposition transcripts, and other exhibit documentation.

Defendant is a nonprofit municipal corporation chartered by the Connecticut General Assembly in 1929 and provides critical water and wastewater treatment services and products to eight member towns and to other municipal entities within its service area.

1

A 29-member Board of Commissioners, referred to as the District Board, governs the District. Seventeen commissioners are appointed by the member municipalities, eight are appointed by the Governor, and four are appointed by the leadership of the Connecticut State Legislature. All commissioners serve without remuneration for terms of six years and those commissioners appointed by the member municipalities and legislative leadership serve until their successor is appointed and qualified, while commissioners appointed by the Governor serve for the defined term.

Plaintiff commenced her employment with defendant in November 1992. By 2007, plaintiff was working as a Senior Human Resources Analyst. The position was a professional level, salaried, nonunion position classified as an "EE-11" in defendant's job classification system. Plaintiff's responsibilities included implementing human resources policies and practices, including recruitment and employment benefits. Beginning in June 2002, plaintiff reported to the Director of Human Resources, Patricia Speicher Werbner.

At plaintiff's request, defendant's then Chief Executive, Charles Sheehan, agreed to meet with plaintiff before work to discuss plaintiff's concerns regarding her supervisor, Ms. Werbner. Mr. Sheehan told plaintiff to put her concerns in writing, which she did in an August 10, 2007, letter to Mr. Sheehan. Part of plaintiff's letter asserted that Ms. Werbner had treated plaintiff in a derogatory and hostile manner for the previous five years. Plaintiff's letter indicated that Ms. Werbner (1) called plaintiff's personal cell phone on her days off; (2) refused to conduct annual performance reviews for plaintiff; (3) failed to address a request to reclassify plaintiff's position to a higher pay grade; (4) made belittling comments concerning plaintiff to HR staff; (5) refused to respond to questions from plaintiff; (6) assigned plaintiff work with little to no lead-time; and

(7) gave inconsistent directives and feedback to plaintiff.

Defendant responded to plaintiff's letter by retaining attorneys Albert Zakarian and Stacey Smith Walsh from Day Pitney LLP to investigate plaintiff's concerns. Attorney Walsh interviewed plaintiff in August 2007. Plaintiff never explicitly stated that her alleged treatment by defendant was based upon her status as a single mother with two special needs children, or her stress and anxiety, or her use of FMLA leave.

Attorneys Zakarian and Walsh concluded that plaintiff's claims did not constitute hostile work environment harassment or a violation of defendant's policies. On September 19, 2007, defendant informed plaintiff of the investigation's findings. Mr. Sheehan also communicated to Ms. Werbner that performance reviews needed to be completed annually. Mr. Sheehan assigned Robert Zaik, Manager of Labor Relations for defendant, and attorney David Ryan to review plaintiff's 2002 reclassification request.

Plaintiff took a leave of absence from January through March of 2008 based upon her own medical issues – major depression and anxiety – and to care for her special needs son.

Defendant approved plaintiff's reclassification request based upon finding, consistent with plaintiff's assertions, that plaintiff performed a quasi-supervisory role. Plaintiff was reclassified to a lead position of HR Technical Officer. This change made plaintiff the highest classified analyst in the HR department at that time. Defendant made the adjustment retroactive to September 2002, the approximate time when the reclassification request should have been completed. As a result, plaintiff received a payment of approximately $18,000.

Plaintiff returned to work from her medical leave on March 31, 2008. Defendant informed plaintiff of her new, reclassification-based job responsibilities at an April 9, 2008, HR

department staff meeting.

Ms. Werbner discussed with plaintiff the need to have plaintiff train other people in the HR department on defendant's software system. Ms. Werbner explained to plaintiff that defendant realized while plaintiff was on medical leave that employees in the HR department were overly reliant on plaintiff, especially with regard to defendant's software system.

Plaintiff again submitted concerns about Ms. Werbner to defendant on April 10, 2008. Plaintiff complained of (1) repeated rescheduling of the meeting to discuss her change in job duties; (2) perceived animosity from Ms. Werbner, based in part on plaintiff's attendance of her son's medical appointment. In response, defendant again hired Zakarian and Walsh to investigate plaintiff's concerns. Their report concluded that no law or policy had been violated; the HR department simply failed to get along. Defendant notified plaintiff of the investigation's findings.

Defendant decided to transfer plaintiff from Human Resources to Customer Service in August 2008. At the time of transfer, Ms. Webner reported directly to Robert Moore, defendant's Chief Administrative Officer. Defendant contends that plaintiff was transferred because it determined that the relationship between plaintiff and Ms. Werbner was not going to be constructive. Plaintiff responds that she was transferred in retaliation for making complaints. Plaintiff was informed of her reassignment on September 10, 2008. Her salary and benefits did not change as a result of the transfer. Defendant directed plaintiff to contact Ms. Evelyn Tousignant, Principle HR Officer, to coordinate the appropriate file transition and status update work.

Plaintiff asserts that she was unable to get in touch with Ms. Tousignant the following

morning of September 11, 2008.  The following Saturday at 7:30 p.m., plaintiff went to work to collect her belongings.  She tried to use her electronic keycard, but it did not work, so plaintiff entered using her metal key.  Defendant then investigated plaintiff's entry and removal of files to determine whether any confidential or sensitive HR department information was improperly removed.  The investigation concluded that plaintiff had not removed any such files.  Plaintiff maintains (1) she had never been told that she was not permitted to collect her belongings; (2) no one told her that she was no longer permitted entry to the HR offices; (3) no one ever asked her to turn in her keycard or metal key; (4) the security officer permitted her entry; (5) other transferred employees were permitted to come in after-hours to collect their belongings; and (6) defendant had no basis to suspect plaintiff as a security risk.

In the Fall of 2008, plaintiff applied for two open positions in the HR department, but defendant considered her ineligible based on her transfer from that department.  Indeed, one of the available positions was plaintiff's previous job.  Plaintiff also contends that she was unable to apply for an opening in the HR department that was posted while she was on leave in early 2008.

Defendant argues that, when asked in her deposition how her inability to apply for the Human Resources Technical Officer position was related to her disability, plaintiff simply claimed, "Because they were aware of my disability at the time."  Plaintiff counters that defendant omits important additional testimony:

> They knew I had taken family medical leave because of my disability and because of the effect that the work environment had on myself, as well as my family.  I met the qualifications for the job.  I had had many years experience performing the job, successfully. And I disagreed with the transfer.  I was not given an opportunity to suggest anything else or to transfer anywhere else.  I was put in a do-nothing position and a cubicle that was about the size of a bathroom stall.

Plaintiff filed a charge with the Commission on Human Rights and Opportunities on November 3, 2008, asserting discrimination, retaliation, harassment, and hostile work environment based upon physical disability and prior opposition to perceived discriminatory conduct.

In June 2010, plaintiff was moved to the District's Emergency Command Center where she reported to Rob Langenauer. Plaintiff's title did not change, but plaintiff contends that her new work was clerical in nature and insufficient to keep her busy.

The parties dispute plaintiff's performance record in her role at the Command Center. Plaintiff asserts that she was being shut out from work so that she would have nothing to do, while defendant contends that new assignments were withheld because plaintiff could not be relied upon to complete her work. During this time, plaintiff's performance reviews were satisfactory.

In October 2011, defendant instituted a reduction in force, based in part on the loss of a large, long-held contract. Defendant unsuccessfully challenged the competitive bidding process for that contract in Hartford Superior Court. The loss resulted in a decrease of $2.1 million in revenue.

Defendant's management met in September and October of 2011 to discuss how to deal with the effects of the budgetary loss. Plaintiff contends that defendant was long aware that the contract was set to expire and began planning contingencies in 2009. The parties disagree as to whether defendant had viable alternatives to the reduction in force, including the elimination of programs or projects.

On October 6, 2011, the District Board of Commissioners held an executive session in

which it adopted the following resolution:

> Be it hereby resolved that the Board of Commissioners of the Metropolitan District hereby directs management through the Offices of the Chief Executive Officer or his designee to eliminate such positions within the District organizational structure as are reasonably and functionally necessary to address the budgetary and financial consequences resulting from the expiration of the District contract with Connecticut Resources Recovery Authority, and in doing so the Chief Executive Officer may in his discretion and in the best interests of the District enter into such agreements with and extend consideration to any individuals affected by the elimination of such positions.

On October 7, 2011, plaintiff's position was eliminated as part of the reduction in force. The parties dispute the methodology that was followed to enact the layoff process. Moreover, plaintiff asserts that her position was "pre-selected" before the formal selection process had commenced.

Following her termination, plaintiff filed a second charge of discrimination and retaliation with the CHRO on October 21, 2011. Thereafter, plaintiff amended her complaint to join claims related to her termination.

## DISCUSSION

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991).

The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. American International Group, Inc. v. London American International Corp., 664 F.2d 348, 351 (2d Cir. 1981). In determining whether a genuine factual issue exists,

the court must resolve all ambiguities and draw all reasonable inferences against the moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then summary judgment is appropriate.  Celotex Corp., 477 U.S. at 323.  If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met.  Anderson, 477 U.S. at 249.

**Burden Shifting Framework**

Plaintiff's ADA, FMLA, and CFEPA claims are subject to the *McDonnell Douglas* burden-shifting paradigm.

First, the plaintiff bears the light burden of establishing a *prima facie* case, which raises an inference of discrimination.  Texas Dept. Of Community Affairs v. Burdine, 450 U.S. 248, 252-54 (1981).  Essentially, the plaintiff must show membership in a protected class, qualification for her position, and sufficiently adverse treatment by the defendant under circumstances giving rise to an inference of discrimination.  Id.  This is a low hurdle.

Second, the burden shifts to the defendant to demonstrate that its adverse actions were taken for legitimate, nondiscriminatory reasons.  The defendant must produce evidence sufficient to raise a genuine issue of fact as to whether it discriminated against the plaintiff.  Burdine, 450 U.S. at 254-55.  The plaintiff's case is rebutted if the defendant's explanation, taken as true, could justify a judgment in the defendant's favor.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 509 (1993).

Finally, the defendant's production having been made, the plaintiff bears the ultimate

burden of persuading the court that she has been the victim of intentional discrimination. See Hicks, 509 U.S. at 511. "She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine 450 U.S. at 256. "[T]he plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." Garcia v. Hartford Police Dept. 706 F.3d 120, 127 (2d Cir. 2013).

**FMLA Retaliation (Count I)**

Defendant argues that plaintiff has failed to allege a *prima facie* case of retaliation under the FMLA and that defendant has demonstrated a legitimate, nondiscriminatory reason for its actions.

To establish a *prima facie* case of FMLA retaliation, the plaintiff must establish that (1) she exercised rights protected under the FMLA; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent. Graziadio v. Culinary Institute of America, 817 F.3d 415, 429 (2d Cir. 2016). Defendant submits that none of plaintiff's allegations of adverse treatment, including (1) removing her job responsibilities in March 2008; (2) involuntarily transferring her out of the HR department in August 2008; (3) denying her the opportunity to apply for two open positions November 2008; (4) subjecting her to an unjustified investigation in the fall of 2008; and (5) exiling her into Customer Service and the Command Center, rise to the level of an "adverse employment action."

Plaintiff responds in part by contending that her transfer from the HR department to the Customer Service department took her out a career in the human resources field that she had spent twenty years cultivating. Moreover, she was removed from a position in which she held status and authority because of her expertise, relegated to a role in which she performed menial tasks, or no work at all. Plaintiff was moved out of defendant's central office to a satellite office and placed in a cubicle about the size of a bathroom stall.

The Second Circuit has stated that "a transfer is an adverse employment action if it results in a change in responsibilities so significant as to constitute a setback to the plaintiff's career . . . where the plaintiff was transferred from an elite unit to one that was less prestigious . . . or where the transfer effected a radical change in nature of the plaintiff's work." Kessler v. Westchester County Dept. Of Social Services, 461 F.3d 199, 206 (2d Cir. 2006) (internal quotation and citation omitted).

Moreover, we apply the *Burlington Northern* standard for materially adverse action in the FMLA context. Millea v. Metro-North R. Co., 658 F.3d 154, 164 (2d Cir. 2011). "For purposes of the FMLA's anti-retaliation provision, a materially adverse action is any action by the employer that is likely to dissuade a reasonable worker in the plaintiff's position from exercising his legal rights." Id. Taken as a whole, and viewed in the light most favorable to plaintiff, a reasonable jury could find that defendant's actions were likely to dissuade a reasonable worker in plaintiff's position from exercising her legal rights.

Defendant has met its burden of production of setting forth a legitimate basis for its adverse employment actions, namely that plaintiff's transfer and change in job duties was initiated to prevent further personality conflict.

"Ordinarily, plaintiff's evidence establishing a prima facie case and defendant's production of a nondiscriminatory reason for the employment action raise a question of fact to be resolved by the factfinder after a trial." Carlton v. Mystic Transp., Inc., 202 F.3d 129, 135 (2d Cir. 2000). Indeed, credibility analysis becomes central to resolving the contradictory explanations, and the factfinder may infer the ultimate fact of discrimination from a combination of plaintiff's *prima facie* case and the apparent falsity of the employer's explanation. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147 (2000) ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."). Here, for example, plaintiff will proffer evidence that her change in position was punitive – a constructive demotion rather than a transfer to a comparable position. A factfinder could infer from such evidence that defendant's proffered explanation is unworthy of credence.

Resolving all factual ambiguities and drawing all reasonable inferences in favor of plaintiff, there is a genuine issue for trial as to whether there is a causal connection between plaintiff's protected activity and defendant's adverse employment actions. See Kessler v. Westchester County Dept. of Social Services, 461 F.3d 199, 211 (2d Cir. 2006) ("[T]he facts pertaining to [defendant's] proffer of a nonretaliatory reason for [plaintiff's] transfer are in dispute, and their resolution is a matter for the jury."). Accordingly, summary judgment will be denied as to plaintiff's FMLA retaliation claim.

**Retaliatory Discharge (Counts IV-VI)**

Defendant argues that plaintiff cannot establish that she was terminated under circumstances giving rise to an inference of retaliatory intent. Defendant cites a lack of temporal

proximity between plaintiff's protected activity and her termination and contends that "plaintiff does not dispute any of the facts underlying [defendant's] explanation of its decision to terminate her employment."

Again, plaintiff has established her *prima facie* cases with respect to these counts. Likewise, defendant has proffered a legitimate basis for terminating plaintiff's employment – its reduction in force.

Plaintiff responds that defendant's decision to select her for layoff came just four months after plaintiff served defendant with discovery requests and four weeks after serving a notice of deposition. Moreover, plaintiff has submitted evidence that plaintiff may have been "pre-selected" as a candidate for layoff – weeks before the layoff selection methodology had been established. Indeed, plaintiff's name appears in multiple documents that contemplate layoff-selection-candidates prior to the official start of the selection process. One of the lists was characterized as having been "randomly" populated, but the large proportion of employees appearing on the list who were eventually selected for layoff raises an inference that the list was not truly random and that defendant's explanation of its decision to terminate plaintiff's employment may be unworthy of credence.

Here, again, contrary to defendant's assertion, plaintiff contests many of the facts underlying defendant's explanation of its decision to terminate her employment. Moreover, "where intent and state of mind are in dispute, summary judgment is ordinarily inappropriate." Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000). Accordingly, summary judgment will be denied as to plaintiff's retaliatory discharge claims.

**ADA and CFEPA Discrimination (Counts II and III)**

Defendant argues that plaintiff has failed to allege a *prima facie* case of disability discrimination under the ADA and the CFEPA and that defendant has demonstrated a legitimate, nondiscriminatory reason for its actions.

To establish a *prima facie* case under the ADA, a plaintiff must show that: (1) her employer is subject to the ADA; (2) she was disabled within the meaning of the ADA; (3) she was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) she suffered adverse employment action because of her disability. McMillan v. City of New York, 711 F.3d 120, 125 (2d Cir. 2013).  Aside from employing a broader definition of disability, the CFEPA discrimination analysis mirrors that of the ADA. Hopkins v. New England Health Care Employees Welfare Fund, 985 F. Supp. 240, 255-56 (D. Conn. 2013).

Defendant does not dispute that it is subject to the ADA, plaintiff's disability or her qualification to perform her job, but only that plaintiff suffered an adverse employment action because of her disability.

Viewed in the light most favorable to plaintiff, defendant began taking adverse actions against plaintiff shortly after it learned of her disabilities and almost immediately after she returned to work from her medical leave of absence.  Again, while a transfer to a comparable position to alleviate personality conflicts can constitute a legitimate business decision, plaintiff contends that her transfer to a less prestigious department with which she had little experience effected a radical change in the nature of her work and setback her career.  Viewed in the light most favorable to plaintiff, a reasonable jury could find that "the transfer created a materially

significant disadvantage with respect to the terms of her employment." See Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 128 (2d Cir. 2004).  Here, the factual circumstances, intent and state of mind of defendant are in dispute.  Accordingly, summary judgment will be denied as to plaintiff's disability discrimination claims.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is DENIED.

Dated this 6th day of September, 2016, at Bridgeport, Connecticut.

    /s/Warren W. Eginton\
WARREN W. EGINTON\
SENIOR UNITED STATES DISTRICT JUDGE